**U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES** | ) | |
| **AND EXCHANGE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  1:13-cv-1361** |
| | ) | |
| **JOHN K. MARCUM and GUARANTY** | ) | **Hon.** |
| **RESERVES TRUST, LLC,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **MARCUM COMPANIES LLC,** | ) | |
| | ) | |
| **Relief Defendant.** | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

Plaintiff, the U.S. Securities and Exchange Commission, alleges as follows:

### <u>Nature of the Case</u>

1.      Since 2010, John K. Marcum has raised more than $6 million from at least thirty-seven individuals by selling them investments in Guaranty Reserves Trust, LLC ("GRT"). Marcum told these individuals that their investment principal was guaranteed, and would never be at risk, because it was secured by valuable assets.  Marcum also promised his investors that he would use their money to earn strong returns by day-trading in stocks.  And Marcum regularly provided his investors with account statements showing that he had used their money to achieve annual returns of more than twenty percent (20%), with no monthly losses.

2.      In reality, Marcum did very little actual trading, and when he did, he suffered losses.  Instead of day-trading, Marcum used his investors' money as collateral for a line of credit.  Marcum used this line of credit to finance several start-up businesses, including a bridal

store, a soul food restaurant and bounty hunter reality television show.  Marcum also used investor money to finance his lifestyle, which included luxury car payments, airline tickets, expensive meals, and hotel stays.

3.     Marcum's scheme began to unravel in mid-2013, when certain of his investors began demanding distributions.  Marcum could not comply, because virtually all of his investors' money is gone.  However, Marcum has attempted to reassure his investors that their investment is secure by producing fabricated documents showing that he has purported net worth of nearly $300 million.  In fact, Marcum is nearly broke, and his accounts contain less than $2,000.

4.     Eventually, Marcum admitted to certain investors that he had lied to them about the use of their funds and the returns they were earning.  Marcum asked these investors to allow him three more years to pay back their money using contributions from new investors.  Marcum has also named certain investors as beneficiaries on his life insurance policies, suggesting that he would be willing to commit suicide so that they could recover their losses.

5.     The Commission brings this action to enjoin Marcum's illegal activities, to prevent him from causing any further harm to his investors, and to stop him from ensnaring new victims in his fraudulent schemes.   The Commission also seeks an award of disgorgement, prejudgment interest and civil penalties.

**Jurisdiction and Venue**

6.     The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 [15 U.S.C. §77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 [15 U.S.C. §§78u(d) and 78u(e)].  This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

7.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because the Defendants reside in this District and the acts, practices and courses of business constituting the violations alleged in this Complaint have occurred within this District and elsewhere.  In addition, the Court may order disgorgement from the Relief Defendant because it received investor assets without a legitimate claim to them.

### Defendants

8.      <u>John Kenneth Marcum</u> ("Marcum"), 49, is resident of Noblesville, Indiana.  He is the principal of Guaranty Reserves Trust, LLC and Marcum Companies LLC.  Marcum was a registered representative with Merrill, Lynch, Pierce, Fenner & Smith Inc. from 1996 through 2003.  Marcum was the CEO and co-owner of ProActiv Advisors, LLC, an investment adviser formerly registered with the Commission, in 2003 and 2004.  Marcum filed for Chapter 7 bankruptcy in 2001, and was discharged from bankruptcy in 2002.

9.      <u>Guaranty Reserves Trust, LLC</u> ("GRT") is an Indiana corporation with its principal place of business in Noblesville, Indiana.  Marcum is the principal of GRT.

10.     <u>Marcum Companies LLC</u> ("Marcum LLC") is an Indiana corporation with its principal place of business in Noblesville, Indiana.  Marcum is the principal of Marcum LLC.

### Facts

#### A.      Marcum Raises At Least $6 Million From At Least 40 Investors

11.     Marcum was a registered representative with Merrill Lynch from 1996 through 2003.  Starting in 2004, he became involved in various business ventures under the name "Marcum Companies, LLC."  In 2010 and 2011, he told several of his business contacts and friends that he was an experienced money manager who could help grow their retirement assets – and those of their family members.

12.     Marcum touted himself to several potential investors, in personal meetings and telephone conversations, as a top-ranked business advisor who achieved great success managing assets for professional athletes and celebrities.  Marcum told at least one prospective investor that, after doing so well for himself, it was his turn to "give back."

13.     Marcum convinced several of his business contacts, friends and their family members, to entrust him with their retirement savings.  Some of these individuals were financially unsophisticated, and did not have enough assets to be considered accredited investors. At least one of these individuals told Marcum that they could not afford to lose their retirement savings.

14.     Marcum told a number of these investors that he was an experienced day trader, and that he could safely grow their money through investments in widely-held publicly-traded stocks, such as Apple Inc.  He promised potential investors that he would use their money to achieve annual returns between 10% and 20%, and told at least one investor that he himself had recently made annual investment returns as high as 35%.  Marcum also told a number of investors that their principal was "guaranteed" and would never be at risk.  Marcum even told at least investor that her principal would be federally-insured.

15.     Marcum assisted many of his investors in setting up self-directed IRA accounts at several trust companies. The investors gave Marcum control of their assets by either rolling their existing IRA accounts into the newly-established self-directed IRA accounts, or by transferring their taxable assets directly to brokerage accounts which Marcum controlled.

16.     Marcum and certain of the investors co-signed promissory notes, created by Marcum and issued by GRT, which Marcum then placed in the IRA accounts.  The promissory notes were securities; they specifically state that the individual is making an "investment" with

GRT.  The promissory notes also repeatedly state that they are "asset-backed," "secured" and "guaranteed," and promise the payment of interest based on "100% of the asset's performance." Finally, the promissory notes state that they are guaranteed with a "collateralized asset."

17.     Marcum raised at least $6 million from at least thirty-seven (37) individual investors, in at least six different states, which he then pooled in bank and brokerage accounts. His investors hoped and expected to profit by placing their investments with Marcum.  There may also be other investors, because Marcum told certain investors that he has access to an additional $10 million of investor money.

18.     From time to time, from 2010 to the present, Marcum and another individual have provided investors with account statements, which showed annual rates of return of more than twenty percent (20%).   The account statements also include pie charts depicting the allocation of assets in each account.  The charts for some investors show that more than 95% of their money is allocated to cash and cash equivalents.  The charts received by other investors showed an entirely different asset allocation, but those account statements report the exact same rates of return.

19.     The account statements which Marcum caused to be provided to his investors also show the "guaranteed" amount of each investment, which is equivalent to the principal invested with GRT less any distributions.   According to the most recent set of account statements provided by Marcum, investors still have more than $6 million of principal invested with GRT. And if the purported interest accrued is taken into account, investors have nearly $8 million invested with GRT.

### B.     Marcum Misappropriates Investor Money

20.     In reality, Marcum did very little trading with his investors' money, and when he

did trade, he almost always lost.  Marcum invested mostly in equities, stock options and Treasury bills.  In total, Marcum lost over $900,000 of investor money through his trading activities.

21.     Instead, Marcum used investor money as collateral for a line of credit at Merrill Lynch.  Marcum took frequent and regular advances from the line of credit, and used them to fund several start-up businesses.  These businesses included:  a bridal store, a bounty hunter reality television show, and a soul food restaurant owned and operated by the bounty hunters involved in the reality show.  However, none of these businesses appear to be profitable.  Marcum's investors were not aware that their money was being used for these purposes.

22.     After using investor money as collateral for advances on the line of credit, Marcum used more than $3 million of the investors' money to pay off the balance on the line of credit, plus the accumulated finance charges, and close out the account.

23.     In addition, Marcum used nearly $1.4 million of the investors' money to make payments directly to various companies, including the companies operating the bridal store, soul food restaurant and bounty hunter television show described in paragraph 21.  These transfers also included payments of $200,000 to a volunteer organization that provides jobs for ex-convicts, and $370,000 to a company which invests in residential rental properties in the Indianapolis area.  Marcum also transferred $503,295 to the Marcum Companies, LLC, a company which he wholly owns and operates.

24.     Finally, Marcum used more than $525,000 of the investors' money to pay personal expenses.  Marcum charged hundreds of thousands of dollars on credit cards for personal expenses, and he used investor money to pay the credit card bills.  These charges included airline tickets, car payments, hotel stays, restaurants, vitamins, gasoline, groceries, and cash advances.  These expenses are described below:

| Description | Amount |
| --- | --- |
| Travel expenses | $65,630 |
| Automobile expenses | $31,717 |
| Drai's Hollywood Nightclub | $27,473 |
| Sports and event tickets | $16,600 |
| Best Buy | $14,343 |
| Charges to ex-wife's credit card | $11,625 |
| Value City Furniture | $10,483 |
| Other personal expenses | $63,170 |
| CitiCards | $38,000 |
| American Express | $10,000 |
| Mercedes Benz Financial Services | $50,692 |
| Chrysler Jeep dealership | $28,496 |
| Ford dealership | $24,666 |
| **Total** | **$526,060** |

### C. Marcum Refuses to Honor Redemption Requests and Initiates a "Recovery Plan" That Includes Soliciting New Investors

25.      In early 2013, several of Marcum's investors submitted redemption requests for the funds they had entrusted to him.  Marcum refused to honor the redemption requests, and make excuses about why he could not make redemptions.

26.      In May 2013, Marcum reassured one nervous investor by providing him with a computer printout purportedly showing Marcum's net worth as more than $275 million. However, Marcum created this printout using a website that allowed Marcum to manually enter false financial data.  In fact, Marcum has virtually no assets or income.

27.      Moreover, Marcum recently told certain investors that he had no money and excessive credit card debt.  All of the bank and brokerage accounts Marcum used to handle investor money are virtually empty.

28.      During 2013, as more GRT investors began making written liquidation requests,

Marcum agreed to participate in a recorded conference call with three investors.  The call occurred on June 18, 2013.  During this call, Marcum made several significant admissions:

- First, Marcum admitted that he was unable to pay back any investor money that had been entrusted to him.

- Second, Marcum admitted that he had misappropriated investor money to fund several start-up businesses, and in doing so he violated the representations he made to investors at the time of their investment.

- Third, Marcum admitted that he had used the investors' principal, in violation of his promise not to do so.

- Fourth, Marcum admitted that he had been falsifying the account statements provided to investors and the statements did not accurately reflect the current value of their investments.

29.     During this conference call, Marcum begged his investors for additional time to recover their money.  He offered to name these investors as beneficiaries on a number of his own life insurance policies in order to guarantee they eventually would be paid in full.

30.     Marcum told these investors that his insurance policies did not contain exclusions for suicide, but there was a two-year waiting period for the "suicide clause" to take effect. Marcum suggested to these investors that, if he was unsuccessful in returning their money, he will kill himself so that they could be made whole.  In fact, after the conference call, Marcum actually designated several investors as beneficiaries on his life insurance policies, and he also increased the face amount of the policies.

31.     Following the conference call, on July 19, 2013, Marcum provided certain investors with a document entitled "Guaranty Reserves Trust Client Capitalization Agreement,"

along with a new three-year promissory note, which contains the same representations Marcum made during the conference call. Marcum called these documents his "recovery plan."

32.     However, Marcum's "recovery plan" maintains the charade that he would use investor funds to make profitable day trading investments.   Marcum did not reveal the significant losses he already had incurred through trading investor funds.

33.     Marcum's "recovery plan" also reveals his intention to continue his Ponzi scheme by soliciting money from new investors in order to pay back his current investors. Marcum claimed that he was "already in the process of adding accounts," and that this would remain his priority as he attempted to repay his current investors.

34.     In fact, Marcum's trading losses and fraudulent transfers to other businesses are so large that the only way he could expect to repay his current investors, without life insurance payments, is by soliciting contributions fraudulently from new investors.  Currently, the accounts of Marcum, GRT and Marcum Companies contain approximately $1,500.

35.     Unless Marcum is enjoined from these activities, he will continue to raise money illegally and defraud other investors.

### COUNT I

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against Both Defendants)**

36.     Paragraphs 1 through 35 are realleged and incorporated by reference as though fully set forth herein.

37.     Defendants have violated Section 5(a) of the Securities Act by, directly or indirectly, making use of any means or instruments of transportation or communication in interstate commerce or of the mails *to sell* a security for which a registration statement is not in effect and for which there is no exemption from registration.

38.    Defendants have violated Section 5(c) of the Securities Act by, directly or indirectly, making use of any means or instruments of transportation or communication in interstate commerce or of the mails, *to offer* to sell a security for which a registration statement has not been filed and for which there is no exemption from registration.

39.    These promissory notes are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 3(10) the Exchange Act [15 U.S. C. §§ 77b(a)(1) and 78(b)(10)].  In addition, the investments which Defendants sold constitute investment contracts.

40.    No registration statement was filed or in effect for the sale of such promissory notes and investment contracts and no exemption applies.

41.    By reason of the foregoing conduct defendants violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### (Against Both Defendants)

42.    Paragraphs 1 through 41 are realleged and incorporated by reference as though fully set forth herein.

43.    By engaging in the conduct described above, Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

42.    Defendants intentionally or recklessly made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and

courses of business described above.  Marcum's *scienter* can be imputed to GRT because he is the owner and operator of the firm.

43.     By reason of the foregoing, Defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

### COUNT III

### Violations of Sections 17(a)(2) and (3) of the Securities Act
### (Against Both Defendants)

44.     Paragraphs 1 through 43 are realleged and incorporated by reference as though fully set forth herein.

45.     By engaging in the conduct described above, Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

(a)     obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(b)     engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

46.     Defendants made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.  Marcum's *scienter* can be imputed to GRT because he is the owner and operator of the firm.

47.     By reason of the foregoing, Defendants have violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act,
### and Exchange Act Rule 10b-5
### (Against Both Defendants)

48.     Paragraphs 1 through 47 are realleged and incorporated by reference.

49.     Defendants, in connection with the purchase and sale of securities, by the use of

the means and instrumentalities of interstate commerce and by the use of the mails, directly and

indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements

of material fact and omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; and engaged in

acts, practices and courses of business which operated or would have operated as a fraud and

deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

50.     Defendants knew, or were reckless in not knowing, of the facts and circumstances

described in paragraphs 1 through 35.  Marcum's *scienter* can be imputed to GRT because he is

the owner and operator of the firm.

51.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange

Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT V
### (Against Marcum Companies LLC)

52.     Paragraphs 1 through 51 are realleged and incorporated by reference as if fully set

forth herein.

53.     Relief Defendant Marcum Companies LLC received and possesses illegal profits

from transfers of investor money from Marcum and GRT, even though it had no legitimate claim

to them.

12

54.     By reason of the foregoing, Relief Defendant Marcum Companies LLC has been unjustly enriched and may be compelled to return any investor funds it still holds, and may be found liable for the remaining transfers it received.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants, jointly and severally, and the Relief Defendant to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the Defendants' violative acts, practices and courses of business set forth

herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other relief as this Court deems appropriate.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: ***/s/Robert M. Moye***
    Robert M. Moye (MoyeR@sec.gov)
    Brian D. Fagel (FagelB@sec.gov)
    U.S. Securities and Exchange Commission
    Chicago Regional Office
    175 West Jackson Boulevard, Suite 900
    Chicago, IL 60604-2615
    (312) 353-7390
    (312) 353-7398 (fax)

    Jill Julian (Jill.Julian@usdoj.gov)
    Assistant United States Attorney
    United States Attorney's Office
    10 W. Market Street, Suite 2100
    Indianapolis, Indiana  46204
    (317) 229-2417
    (317) 226-6125 (fax)

    *Attorneys for the Plaintiff*